WILLIAM T. BURGESS

*v.*

ALPHEUS C. BADGER *et al.*

*Filed at Ottawa January 19, 1888.*

1. CONTRACT—*in respect to prosecuting certain suits, and division of fees for legal services—contract construed, as to the classes of creditors included, and as to deducting costs from the fees.* A written contract was made and punctuated as follows: "Whereas for want of an agreement in writing, there may be some misunderstanding as to the contract existing between A, B and C, in regard to prosecuting certain suits in the interest of the estate of W. in bankruptcy, this memorandum is made for the purpose of putting said agreement in writing as follows: The suits prosecuted under this contract are: (naming them), and the agreement is that of whatever fees may be realized either under contracts with creditors of W or from J. assignee out of the funds received by said estate from or by reason of said suits, A is to receive one-fourth; B one-fourth and C one-fourth: C retaining the remaining one-fourth as a compensation for the raising of money which was necessary to carry the suits to the higher courts. January 15, 1881." *Held*, that the contract extended to secured as well as unsecured creditors of W., and was not limited to unsecured creditors.

2. The same contract, being between two attorneys and an accountant for the joint prosecution of the suits named, provided, "that whatever fees may be realized, either under contracts with" the creditors of the bankrupt, or from the assignee out of the funds received by the estate, etc., the two attorneys should each receive one-fourth and the accountant one-fourth, he to retain the other fourth as compensation for raising money to carry the suits to the higher courts: *Held,* that the fees to be divided were the sums realized after the payment of the costs and expenses incurred in the litigation, and not the gross amount of fees received.

3. By such agreement there was that joint interest of the same nature in the particular venture, which constituted the parties partners, and there being no stipulation in regard to the payment of costs and expenses, they must be paid by the firm, and must be deducted from the gross amount of fees received, before any division can take place.

4. The provision in the contract, that the accountant was to retain the remaining one-fourth of the fees received, "as compensation for the raising of money to carry the suits to the higher courts," does not require him to pay for any other costs and expenses that the firm might incur in the prosecution of the joint enterprise. If one partner advanced money to defray such costs and expenses, this inuring to the benefit of all, he is equitably entitled to contribution from his co-partners.

5.   SAME—*construction by the parties—how far controlling—all must concur.*   Where the terms of an agreement are in any respect doubtful or uncertain, and the parties to it have, by their own conduct, placed a construction upon it which is reasonable, such construction will be adopted by the court, and in such case the court should endeavor to place itself in the position of the contracting parties, the better to understand the language employed in the sense intended by them.   .

6.   In the case of a verbal contract between A, B and C, for the prosecution and defence of certain claims and suits, and for a division of fees realized, a construction put upon such contract by two of the parties, without the assent of the third, is not binding on either or any of them, and this construction can not be admitted to contradict or vary the terms of a subsequent writing entered into by all, setting forth what the original agreement was.

7.   SAME— *change of contract—concurrence of all the parties required.* One of the parties to a contract can not change or cancel it, and when there are three parties to it, two of them can not do so without the consent of the other, for the reason that a change or abrogation of an existing contract is a new contract, to which the same parties as were necessary to the making of the original contract are indispensable.

8.   SAME—*rule of construction—recitals.*   It is the rule, in the construction of contracts, that where the words in the operative part of an instrument are of doubtful meaning, the recitals preceding the doubtful part may be used as a test to discover the intention of the parties and fix the meaning of the words.   This does not mean, however, that the language of the recitals alone shall be looked to, but that the entire language shall be considered,—that included in the recitals as well as that included in the operative part of the instrument,—and from the whole ascertain the intention of the parties.   .

9.   PARTNERSHIP—*dissolution, by act of one partner.*   While the failure of one partner to perform his part of the contract may authorize the other partners to refuse to go on with the partnership, and to have a dissolution declared, yet the contract of partnership can no more be cancelled by the act of a part of the partners than any other contract.   The rights of a party under an executory contract, are, in a legal sense, property, of which he can no more be deprived without his consent than he can be of his tangible property.

10.   The fact that one partner, as an attorney, under an agreement among the partners for the prosecution and defence of certain suits, neglected to prepare a bill, and withdrew from another case, there being no serious culpability in his conduct, can not avail as evidence of his abandonment of his partnership contract, especially when such contract is afterward acknowledged by all the parties by reducing the same to writing.

11.   SAME—*charge for services by one partner.*   In the absence of an agreement to that effect, one partner is not entitled to charge his co-partners

19—124 ILL.

for his services because he has done more than his just proportion of the work. The law never measures and settles between partners their various and unequal services bestowed on the joint business.

12. SAME—*one partner buying in outstanding title on the request of another—estoppel.* After the filing of a bill to settle a partnership account and business, one partner paid out a certain sum to buy in an outstanding title, on the request of another partner to protect the interest of the firm: *Held,* that the partner so requesting such purchase could not be allowed to object that the purchase was improper.

WRIT OF ERROR to the Appellate Court for the First District; —heard in that court on writ of error to the Superior Court of Cook county; the Hon. HENRY M. SHEPARD, Judge, presiding.

One Samuel J. Walker having become largely indebted, and to many parties, was being pressed for payment of his debts, and sued for the collection thereof in different courts, both Federal and State, in Cook county. Some of his creditors were secured, but many were unsecured. William T. Burgess, an attorney at law, was employed by Walker to make defences for him in some of these suits, and, at the same time, Alpheus C. Badger, an experienced accountant, and likewise a creditor of Walker, was engaged in investigating the condition of Walker's indebtedness, assets, etc., and in ascertaining and collecting facts material to the making of such defences. Walker neglecting to make satisfactory payments to Burgess for his services, Burgess abandoned his cases,—probably late in 1877 or early in 1878. Badger continued his labors, and after the abandonment of Burgess he procured Joseph N. Barker, an attorney at law, who had before been interested for a client in some litigation affecting Walker's property, to take the place of Burgess in making defences for Walker. On the 26th of April, 1878, Walker, on his own petition, went into bankruptcy, Barker preparing the petition, and on the 10th of May, 1878, Robert E. Jenkins was, on the motion of Burgess and Barker, appointed provisional assignee of Walker. Some time in the spring of 1878, Badger and Barker entered into a contract,

which was very soon afterwards enlarged to include Burgess, for the purpose of defending the estate of Walker against certain claims, and of collecting, etc., the claims of creditors against his estate. This contract was verbal, but it is claimed that it was reduced to writing on the 15th of January, A. D. 1881. Work was done under the contract by all the parties, but after a time Burgess claims that Barker failed to perform his part of the contract, and that the contract was then cancelled as to Barker, so far that he, thereafter, had no interest in what was done by Burgess and Badger, and that a new contract was then made between Burgess and Badger. Burgess claims that under this new contract between himself and Badger, about the 25th of July, 1884, Badger collected from Cyrus H. and Leander J. McCormick, $7000, of which he is entitled to one-half, and Badger having paid him only $1348.56, and refused to account to him for any greater sum, Burgess filed his bill against Badger, for an account of the balance of the one-half of the $7000, in the Superior Court of Cook county. Answer was filed by Badger, and, subsequently, Barker was permitted to intervene and file answer and cross-bill. Barker alleged, in his cross-bill, the making of the verbal contract between himself, Burgess and Badger, the subsequent reduction of that contract to writing, and that the $7000 was received by Badger under that contract, and that by its terms he is entitled to one-fourth of the $7000. He also further alleged the receipt of other sums by Burgess and Badger, of which he is entitled to receive one-fourth. He prayed for an account of the partnership transactions, that Badger be restrained from paying Burgess any further sum, and for general relief. Badger also filed a cross-bill, alleging the making of the verbal agreement, its subsequent reduction to writing substantially as alleged in Barker's cross-bill, and that he received the $7000 under the contract between himself, Burgess and Barker. He further alleged various transactions pursuant to that contract, and that Burgess had become indebted to him under the con-

tract, and he also prayed for an account. Answers were filed by Burgess to these cross-bills, and he also subsequently filed an amended bill, more elaborately and in detail setting up his claims against Badger and Barker. The cause was referred to the master in chancery, to take and report the evidence, with his conclusions thereon. The master reported, and various exceptions were taken to his report. Some of the exceptions were sustained, and the cause was again referred, with instructions, to the master. The venue was then changed, on the application of Burgess, to another judge of the same court. The master afterwards reported, and, on exceptions being filed to this report, it was agreed that the court should examine the evidence, and make his own findings, and state the account without any further reference. Certain sums were found to be due from Burgess and Badger, each, to Barker, and a sum was found to be due from Burgess to Badger,—all of which were decreed to be paid. Burgess then prosecuted a writ of error on that decree from the Appellate Court for the First District, and that court affirmed the decree of the Superior Court. This writ of error is brought to review that judgment of the Appellate Court.

Mr. JOHN N. JEWETT, for the plaintiff in error.

Messrs. LYMAN & BADGER, for the defendant in error Badger.

Mr. JOHN WOODBRIDGE, for the defendant in error Barker.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The writing executed by Barker, Burgess and Badger, was written and punctuated as follows:

"Whereas for want of an agreement in writing, there may be some misunderstanding as to the contract existing between Joseph N. Barker, William T. Burgess and A. C. Badger in regard to prosecuting certain suits in the interest of the estate of S. J. Walker in bankruptcy, this memorandum is made for

the purpose of putting said agreement in writing as follows : The suits prosecuted under this contract are: The International Bank *v.* R. E. Jenkins, assignee Aug. Bauer *v.* Same ; R. E. Jenkins assignee *v.* Union Trust Co., Greenbaum & Foreman *et al.*, and cross-suit; Eli Kinney *v.* Bauer *et al.*, and the agreement is that of whatever fees may be realized either under contracts with creditors of Sam'l J. Walker or from R. E. Jenkins assignee out of the funds received by said estate from or by reason of said suits, J. N. Barker is to receive one-fourth ; W. T. Burgess one-fourth and A. C. Badger one-fourth ; A. C. Badger retaining the remaining one-fourth as a compensation for the raising of money which was necessary to carry the suits to the higher courts.

*Jan'y 15, 1881.*                              JOSEPH N. BARKER,
                                                              W. T. BURGESS,
                                                              A. C. BADGER."

The contention of Burgess is, that this is limited to unsecured creditors—that the word "creditors" is controlled by the recitals, the immediate context, and the immediate surroundings, to the unsecured creditors of Walker ; while the other parties contend, and the lower courts held, that it extends to secured as well as unsecured creditors. In our opinion this is the correct construction. It is the rule, as contended by counsel for plaintiff in error, that where the words in the operative part of an instrument are of doubtful meaning, the recitals preceding the doubtful part may be used as a test to discover the intention of the parties and fix the meaning of the words. (*Walker et al.* v. *Tucker et al.* 70 Ill. 527.) But this does not mean that we shall look at the language of the recitals, alone. It simply means that we shall look at the entire language,— that included in the recitals as well as that included in the operative part of the instrument,—and from the whole ascertain the intention of the parties.

The recitals, here, do not assume to describe or limit the scope of the undertakings of the parties. They say, in effect,

that the writing is executed, because otherwise "there may be some misunderstanding as to the existing contract, between the parties, in regard to prosecuting the suits," which are named in the operative part of the instrument, "in the interest of the estate of S. J. Walker in bankruptcy." The word "estate," in this connection, clearly means property. Under no definition can it be made to include creditors, and so, "in the interest of the estate of S. J. Walker in bankruptcy," must mean, in the interest of the property of S. J. Walker in bankruptcy, and this includes all the property he had, and every legal interest that he had in property to which creditors might resort for the payment of debts. "In the interest," we can only understand as meaning benefiting, by extinguishing or reducing liens or other incumbrances. It would seem quite significant that it is said the suits are prosecuted in the "interest of the estate," and not in the interest of the assignee in bankruptcy, or of creditors proving claims in bankruptcy, as we must assume would have been said if it had been intended. Being in the interest of the estate or property, the resulting benefit must necessarily be primarily for all having a right to look to that estate or property for the payment of debts, and ultimately for the owner. Manifestly, creditors secured by junior liens (especially where there was any question of the adequacy of their security,) upon property whereon prior liens were sought to be removed or reduced by prosecuting the designated suits, would be benefited thereby, and might, in many instances, more readily than general creditors, be expected to be willing to pay for services thus rendered. How the parties anticipated they would be paid for rendering this service "in the interest of the estate in bankruptcy," is not expressed in the recitals, but is left to be expressed in the operative part of the instrument. It must be obvious that they could only have anticipated they would be compensated by payments to be made by those to be benefited, and that all that would be benefited would be willing to contribute in some measure proportioned

to benefits. Those who would most certainly be benefited were what are spoken of as "secured creditors,"—not required to prove their claims in bankruptcy,—but whose security was inadequate unless prior liens, the subject of the designated suits, were removed or reduced. General creditors could have no interest in these suits unless the property involved would more than pay all liens upon it,—a contingency which, in fact, never happened. It would therefore have been, to say the least, extraordinary, that men fully informed, as were these parties, of the condition of Walker's estate, and two of them learned in the law, should have entered into a contract for the prosecuting of suits to remove or reduce prior liens upon property, which would certainly benefit junior lienors, but which could only, by a remote probability, benefit, materially, general creditors, with the expectation and understanding that their only compensation would be derived from general creditors.

Burgess admits, that punctuating the language of the operative part of the instrument one way, it will include secured as well as unsecured creditors. Since, therefore, the language, as the instrument was written, was not punctuated at all, it would seem plainly to be required to be punctuated in this way, so as to give a reasonable, rather than an unreasonable, construction, as thus: "And the agreement is that of whatever fees may be realized either under contracts with creditors of Samuel J. Walker, or from R. E. Jenkins assignee out of the funds received by said estate from or by reason of said suits" etc. The word "creditors" not being qualified, includes, of course, junior lienors, as well as unsecured creditors. We do not think it of moment, that this construction makes certain words redundant, for it is impossible to adopt any construction which will not disclose some redundancy of language. It is, moreover, a familiar rule, that when the terms of an agreement are in any respect doubtful or uncertain, and the parties to it have, by their own conduct, placed a construction upon it which is reasonable, such construction will be adopted

by the court. (*People ex rel.* v. *Murphy*, 119 Ill. 159.) And it is also, in such case, required, that the court place itself in the position of the contracting parties, the better to understand the language employed, in the sense intended by them. *Wilson* v. *Roots*, 119 Ill. 386, and authorities there cited.

We find no contradiction in the evidence in regard to the origin of the contract. Burgess and Barker, as attorneys at law, and Badger, as accountant and business agent, had become familiar with Walker's affairs, and the character and extent of litigation in which he was involved. They believed that by taking the cases named in the writing, to the higher courts, the liens upon Walker's property involved in them could either be removed or materially reduced, and thereby that junior lienors would certainly be, and that general creditors might be, materially benefited, and, therefore, that profitable contracts could be obtained, both from junior lienors and general creditors of the estate, to prosecute the suits named. The multiplicity and conflicting character of the liens of secured creditors rendered much investigating and contracting, or litigating, proper, if not, indeed, absolutely necessary,—so both the services of the business man and the lawyer were in demand. Some contracts had been made in reference to the collection of claims against Walker, before the making of the verbal agreement, and they related to both secured and unsecured claims. Badger and Barker each testified that the verbal agreement included secured as well as unsecured claims against Walker and his estate. Their language in this respect is, "every kind of suit and contract with his creditors," * * * everything that we were to do with or for the creditors of this estate of S. J. Walker,—and this is virtually admitted by Burgess. It is also shown, that after the making of the verbal agreement, Badger obtained contracts, in his own name, but for the benefit of the three, from many parties, in respect of both secured and unsecured claims, and that every contract on which Burgess was held liable in the account, as finally

made up by the chancellor, was obtained before the instrument in writing of January 15, 1881, was signed. The master held him liable on a contract obtained after that date, but the chancellor, in correcting the account, rejected it. The evidence, moreover, shows that the McCormick contract, the money received upon which is the chief bone of contention in this litigation, was in relation to a claim of the McCormicks which was a junior lien upon property upon which the Greenbaum & Foreman suit was prosecuted to enforce a prior lien, and that the defence in that suit enabled Badger to make, ultimately, the adjustments whereby he earned and received for the three the $7000, and so the McCormick contract fell directly within the results of the prosecution of the suits specifically named in the instrument of January 15, 1881; and both Badger and Barker testify, in addition, that the McCormick contract was obtained under the verbal agreement, for the benefit of the three parties. Beyond question, therefore, the parties themselves, from the making of the verbal agreement, understood "creditors of Samuel J. Walker" to mean secured as well as unsecured, and so they must therefore have intended it to mean in the written instrument of January 15, 1881.

But conceding that the parties originally intended, by the verbal agreement, secured as well as unsecured creditors, Burgess contends that the original agreement was departed from and intended to be changed by the parties before the execution of the written instrument of January 15, 1881. It can hardly be necessary to cite authorities to so plain a proposition, as that one party can not change or cancel a contract, or, when there are three parties to it, that two of them can not do so without the consent of the other. One or two parties to a tripartite contract may, indeed, refuse to perform it, and may take the legal consequences resulting therefrom; but they can not go on and do what the contract requires them to do, and say that the remaining party shall have no interest in it, he

meanwhile not having consented to any abrogation or change
of the contract. And the reason is obvious. A change or abro-
gation of an existing contract is a new contract, to which the
same parties that were necessary to the making of the original
contract are indispensable. Bishop on Contracts, (1st ed.)
chap. 33. Undoubtedly a partnership at will may be dissolved,
as contended by plaintiff in error, at the express desire of any
of the parties; but a partnership for the doing of certain spe-
cified things, as was here agreed, is not a partnership at will,
but for a term implied, measured by the length of time reason-
ably required to do those things.

It may be proper to observe, to avoid misapprehension, that
Burgess, Barker and Badger stand before us equally, presum-
ably, entitled to credit. The former two hold, each, a license
from this court to practice law, and there can be nothing pre-
sumed against either. There is testimony given by Burgess
to the effect that he was dissatisfied with Barker,—that Bar-
ker, in his opinion, was not doing his part of the work, and
that he so told Badger, and also that he told Badger that he
was not willing to proceed, allowing Barker an equal amount
of the proceeds of the business. Badger does not testify that
he ever communicated these remarks to Barker, and Barker
testifies that they never were communicated to him. Most of
these declarations are claimed to have been made by Burgess
before January 15, 1881, and yet, by the instrument then exe-
cuted, all the parties thereto expressly admit an existing con-
tract, the terms of which are thereby to be rendered certain.

On the 1st of November, 1879, Burgess addressed a letter
to Barker, stating what he understood the contract to apply
to, and Barker replied to it on the 11th of the same month.
Burgess seems to contend that this amounted to a modifica-
tion of the verbal contract; but it is quite apparent that it did
not, because, first, the letters are only between Burgess and
Barker, and, of course, therefore could not affect Badger; and
second, they do not assume to be the statement of a new

contract, but merely to be what each understands in regard to
certain parts of an existing contract. Burgess' letter, however,
is pertinent, as contradicting the claim he now makes that the
contract did not include secured creditors, for he writes that
the contract included "all contracts in the hands of Badger,
which may be settled out of any general fund in the hands of
S. J. Walker's assignee in bankruptcy, and to any contracts
at *this date* in the hands of Mr. Badger, having reference to the
suits of *International Bank* v. *Walker, Bowen* v. *Walker*, and
*Greenbaum & Foreman* v. *Walker*," etc.

There was, under the evidence before us, nothing in the
verbal contract limiting it to contracts in the hands of Badger
on the 1st of November, 1879, and whatever doubt there may
be as to the proper construction of the instrument executed on
the 15th of January, 1881, in other respects, there is no pre-
tense that, by its terms, it was limited to such contracts, having
reference to the suits of *International Bank* v. *Walker, Bowen*
v. *Walker*, and *Greenbaum & Foreman* v. *Walker*, etc., as were
in the hands of Badger on the 1st day of November, 1879.

Again, Burgess contends that he refused to go on with the
contract unless it should be changed, and that the writing of
January 15, 1881, was drawn up and signed for the purpose
of changing it. Unfortunately for this view he made no such
communication to Barker. Barker's testimony is, that he
signed it, not for the purpose of changing the contract, but for
the purpose of reducing an existing verbal agreement to writing.
His language is: "Badger came to my office, and said, 'Mr.
Barker, we have not a written contract as to what our arrange-
ment is. I have reduced a little (our verbal) contract here to
writing.' There was nothing said by Badger further than that
it was to reduce our contract to writing. I read it, and I be-
lieved it carried out the spirit of our original contract. With
that understanding I signed that contract, and we continued
under that. I never had any word with Burgess in relation
to the contract, one way or the other, and we continued right

along up to, so far as I know, the present time." Badger testified, that after the contract was signed, and after conversations thereafter had with Burgess, he and Burgess came to the conclusion that the written contract changed the verbal contract; but he does not state that he signed it with the understanding that it should have that effect, or that he informed Barker that it was designed to have that effect. He was asked: "Was anything said in your conversation with Barker, at the time he signed the written contract, that it was different from the verbal contract?" And he answered: "I do not remember that there was." He was again asked: "When you presented this contract to Mr. Barker for signature, didn't you state to him that it was merely reducing to writing their original agreement?" He answered: "I have no idea,—no recollection of the conversation. * * * I have no remembrance of what I did say to him." He had also been previously asked on what ground he thought Barker had given up his rights, and he had answered: "Because we" (that is, himself and Burgess,) "determined that the contract had a different meaning from what the verbal contract had." And so the testimony of Barker on this point is uncontradicted.

There was an agreement made between Badger and Burgess subsequent to the 15th of January, 1881,—that is, on the 21st of that month,—in regard to matters not included in that instrument; but Barker was neither party nor privy to it, and, of course, was therefore unaffected by it.

Conduct of Barker in neglecting to prepare a bill in chancery as requested by Burgess, and in withdrawing his name from a certain suit as counsel for Walker, is insisted upon as evidence of an abandonment of the contract by Barker. We think the evidence sufficiently shows that Barker was not seriously culpable in either of these respects, and, in any event, both were occurrences long before the signing of the instrument of January 15, 1881, which, as we have seen, expressly admits the existence, at that time, of the contract.

Burgess has discussed, in his argument, his right to dissolve the partnership, and he, in effect, insists that Barker had no vested property rights in it. That a bill to specifically perform a contract of partnership will not lie, especially when such partnership is limited to personal services to be performed in the future, is doubtless true, and it is also doubtless true that a partner may voluntarily abandon his rights under a partnership contract, and that the failure of one partner to perform his part of the contract may be sufficient reason for the other partners to refuse to go on with the partnership, and to have a dissolution declared. But a contract of partnership can no more be cancelled by the act of a part of the partners, than any other contract can be cancelled by a part, only, of the contracting parties, and the rights of a party under an executory contract are, in a legal sense, property of which he can no more be deprived, without his consent, than he can be of his ownership of tangible property. The evidence, it has before been seen, fails to show that Barker ever consented to a dissolution of the partnership, and the mere fact that he may have been inattentive or negligent in the performance of his duties, is plainly not sufficient to prove an abandonment, and we have before observed, that the specific evidence of acts of abandonment of the contract, relied upon by Burgess, are insufficient.

Again, it is contended by Burgess, that under all the evidence he is entitled to have the value of his services estimated, and to a proportionate compensation, and he cites *Webster* v. *Bray*, 7 Hare, *159, in support of that contention. It is enough to say of that case, that so much of the opinion as is supposed to be pertinent here, is predicated upon an agreement between the parties. The evidence here fails to show an analogous agreement between Burgess and Barker. We believe the rule to be well settled, that in the absence of a stipulation to that effect, one partner is not entitled to charge his co-partners for his services, or because he has done more than his just pro-

portion of work.   The law never undertakes to measure and to settle between the partners their various and unequal services bestowed on the joint business.   Collyer on Partnership, (Perkins' ed.) sec. 183.

The next question to be considered is, What is meant by the word "fees," as used in the instrument of January 15, 1881 ? Burgess contends that it means gross receipts for services rendered in the particular cases, while the court below held that it means the amount received by the partnership after the payment of all expenses incurred in earning them.   Badger and Barker agree in testifying, that by the verbal contract the costs were to be paid before a division of receipts; but the writing of January 15, 1881, says nothing about costs and expenses, and speaks only of fees to be divided between the parties.

By the agreement, there was, clearly, that joint interest of the same nature in the particular venture which constituted the parties partners.   *Robbins* v. *Laswell,* 27 Ill. 365; Collyer on Partnership, (Perkins' ed.) secs. 18, 19; Parsons on Partnership, p. 41.   A communion of profit implies a communion of loss.   (Collyer on Partnership, sec. 18, *supra.*)   Of course, this may be otherwise provided by contract, but in the absence of contract this is the rule, (Parsons on Partnership, p. 41, *supra,*) and hence it will follow, there being no stipulation in regard to the payment of costs and expenses, that they are to be paid by the firm, and so their amount must necessarily be deducted from the gross amount of fees received, before there can be anything to divide between the partners.

Burgess, in a very long and ingenious argument, opposes many objections to this view, the substance of which may be considered under two heads:   First, that it is opposed by Badger's own pleadings; second, that it is not sustained by a reasonable construction of the language of the instrument. We shall briefly examine these in their order.

*First*—Badger, in his cross-bill, alleged that Barker and Burgess were to attend to the law part of the business, and that he was to attend to the facts and figures of the business; and Burgess contends that the law business does not include advancing money for costs, and that "facts and figures," therefore, must. But this conclusion, plainly, can not follow. Badger was an accountant, and when it is said that a person who is known to be an accountant is "to attend to facts and figures," it would seem there can be no difficulty in comprehending what is meant. No one, surely, could understand it to be an undertaking to advance money. It is an undertaking to advance nothing, but simply to attend to particular duties, presumably rendered necessary by the business for which the parties were united,—namely, to hunt up facts in regard to the different claims against Walker's estate, the existence, situation and condition of his property, and to make the necessary calculations in reference thereto. It seems to be assumed by Burgess, that some one must expressly have assumed, in the writing, to advance money, and that because he and Barker did not do so, Badger must have done so. But it is evident this can not be true. If a specific undertaking is entered upon which requires money to be expended, furnishing the money is an obligation incident to the undertaking, and it falls upon all the parties entering upon the specific undertaking, unless they expressly stipulate otherwise. As, for instance, if A, B and C enter into an agreement to buy and sell grain, saying nothing about furnishing money with which to buy, the duty would undoubtedly rest upon A, B and C, equally, to advance the money, in proportion to their respective agreed interests.

Again, Badger, in his cross-bill, sets out the instrument of January 15, 1881, witnessing the agreement between himself, Barker and Burgess, and also the instrument of the 21st of the same month, witnessing the agreement between himself and Burgess alone, and then proceeds to place his construction upon them, and in doing so used the language, that in the

first named instrument it is agreed, among other things, "that the *amounts recovered* shall be divided," etc., and in the second named instrument, that "*amounts received*" shall be divided, etc.; and this is claimed to be inconsistent with his prior allegation, that, by the verbal agreement between the parties, the sums advanced should be refunded before a division of the fees, and conclusive that the fees are, by the written instrument, to be divided before advances are refunded. We think that, from the whole bill, it is quite clear that Badger did not use the word "recover" in the sense of excluding the repayment of advances before the distribution of fees. Indeed, there are specific allegations to the contrary, which we deem it unnecessary to transcribe. But it is a sufficient answer to this contention that he makes an exhibit of each instrument, and his allegation of their meaning, therefore, if not authorized by them, can avail nothing, but must be regarded as surplusage.

*Second*—But Burgess again contends, that the fact that it is stipulated that "A. C. Badger retaining the remaining one-fourth as a compensation for the raising of money to carry the suits to the higher courts," it follows that no other fees were intended to be provided for. Concede this to be true, it simply follows that there is no provision for the advancement of money for any other purposes. The maxim, that the expression of one is the exclusion of another, applies with equal pertinency to Badger as to the others. We may go farther, and concede that it is not contemplated by the written instrument that there will be a necessity for the advancement of money for any other purposes. It certainly must be obvious that the partners might have gone on without spending any more money. Whether it would have been profitable to have done so, concerned them alone. They were not obliged to go on and incur additional expenses, and whether they should do so or not, as the occasions presented, was for them to determine, in which one had just as much authority as another. It was competent, as the occasions presented, to make special

agreements in regard to the advancing of money, and Badger testifies that such agreements were here made, and that the amounts advanced should be refunded before a division of fees among the partners. But if such special agreements were not made, but it was yet determined to go on and do that for the benefit of the firm which could not be done without the expenditure of money, it is clear that since the expense would be for the benefit of all, it should be paid by all; and if one member advanced the amount, he would be equitably entitled to contribution from his partners. Story's Eq. sec. 504.

It is unnecessary to look into dictionaries for the definition of the word "fees." There is no ambiguity in its meaning as here used. It plainly means the money received for the services of these parties, each and all. When earned, they belong to the firm, and constitute that which is to be divided between the parties; but they also, at the same time, constitute the fund, and the only fund, from which debts can be paid. The line of argument pursued by Burgess seems to ignore the fact of the entire equality, to the extent of their designated interests, of all the partners, and to assume that Badger is under some primary liability, not resting on the others, to make advancements, in the absence of stipulation exempting him. There is nothing in the character of duties assumed by Badger making him exceptional, and the circumstance that Badger's claim for advances exceeds that of either of the others, is the result of no primary contractual relation, but of convenience to the other parties, only. It is not perceived that the equitable rights of Burgess and Barker, in this respect, are different than they would have been if the same money had been advanced by a stranger.

We have omitted to notice some other matters adduced in argument on the questions we have considered, not because we have not considered them also, but because we deemed them untenable, and that their discussion at length was unnecessary.

Several objections are taken to the account as stated. It is objected that the court ought to have taken and stated an account, as between Burgess and Barker, of matters under the contract of January 21, 1881. We think the evidence clearly shows that the only item that there is any plausibility for saying comes under that contract, is the Converse contract, and the chancellor, on the ground that it did come under that contract, held that Burgess was not required to account for the amount that he received under it. Whether the chancellor was correct in that ruling, or otherwise, Burgess has certainly been allowed to retain all to which he has shown himself entitled. The contract between Burgess and Badger, of January 21, 1881, has no reference to fees earned by them, conjointly with Barker, under the instrument of January 15, 1881, but refers solely, by its express terms, to matters beyond those referred to in that instrument. And hence there was properly no account taken between them, alone, of fees earned conjointly with Barker under the instrument of January 15, 1881.

An objection is urged, and commented upon at considerable length, because no account is rendered by Badger of $500 that he received from Whitaker to aid in taking to the higher courts the cases specifically designated in the instrument of January 15, 1881. But it does not appear that Burgess has any interest in that money. He is charged with nothing by reason of it, and no fund in which he is entitled to participate is depreciated by Badger's failure to account for it. It rests wholly as a matter of private concern between Whitaker, Barker and Badger. If Badger had taken credit for the amount he has paid to refund it, then Burgess might have complained; but he has not done so.

It is objected that Badger is improperly credited with $750 paid by him in 1885, since this suit was commenced, to buy in an outstanding title. The testimony shows that that purchase was made by the request of Burgess to protect the in-

terests of the partners. It does not now lie in his mouth to say that the purchase was an improper one.

Objection is urged because a letter, known as the "Pierce-Speed letter" of April, 1877, was admitted in evidence without any proof of its acceptance by Speed. The objection is not well taken. Badger testified that the Speed contract was a contract between the Third National Bank and Speed, and that Badger's contract was with Speed, and that that contract was one of the contracts that came in under his "arrangement with Burgess and Barker." The testimony is, that the negotiations between the bank and Speed were conducted by Badger, and Badger afterwards made an arrangement with Speed.

There are some other objections urged to the decree, of minor importance, but we do not think they are tenable. We are unable to say, in any respect, that the decree is not sustained by the evidence.

We do not perceive any satisfactory reason for reversing the judgment of the Appellate Court, and it is therefore affirmed.

*Judgment affirmed.*