Lucile Forrester Fry, Appellant, v. Lloyd A. Fry, Appellee.

Gen. No. 43,877.

Opinion filed November 19, 1947. Released for publication December 24, 1947.

NATHAN HAFFENBERG, JOSEPH ROSENBAUM and SON-
NENSCHEIN, BERKSON, LAUTMANN, LEVINSON & MORSE,
all of Chicago, for appellant; NATHAN HAFFENBERG,
JOSEPH ROSENBAUM, JOHN L. DAVIDSON, JR. and ISAAC E.
FERGUSON, all of Chicago, of counsel.

LEDERER, LIVINGSTON, KAHN & ADSIT, of Chicago, for
appellee; HARRY H. KAHN and RICHARD C. BLELOCH,
both of Chicago, of counsel.

MR. PRESIDING JUSTICE LEWE delivered the opinion
of the court.

This is an action for divorce and an accounting of
community property alleged to have been acquired by
defendant during marriage and while the parties were
domiciled in the State of Texas. Upon a hearing be-
fore the chancellor a decree was entered granting
plaintiff a divorce but denying her prayer for an ac-
counting. Plaintiff appeals from that part of the de-
cree which denied her prayer for an accounting.

The principal issue presented for determination is
whether the Frys changed their domicile from Texas
to Illinois in June 1932 or in April 1936.

On December 12, 1944, plaintiff filed a sworn com-
plaint alleging among other things that "at the re-
quest of defendant, the plaintiff temporarily remained
in Texas with her son, then an infant, in the home
theretofore owned and occupied by plaintiff and de-
fendant in Texas; that when defendant determined
that he would permanently reside in Illinois, plaintiff

and her son in 1932 came to this State and plaintiff thereafter resided with defendant in Chicago, Illinois until their separation [1944] as heretofore averred.''

On March 6, 1945, plaintiff filed an amended complaint alleging, *inter alia,* that from and after their marriage February 12, 1922, they resided and were domiciled in the City of Dallas, Texas until some time in the month of April 1936; that from 1922 until some time in April 1936, defendant acquired and accumulated considerable property which by the laws of Texas became community property and although managed and controlled by defendant one half belonged to plaintiff; that while retaining the family domicile in the State of Texas defendant continued in the roofing business in the State of Illinois and removed to this State from Texas part of the community property.

In his answer to the amended complaint defendant denied that he and plaintiff resided or were domiciled in the State of Texas since 1932. It appears that defendant made substantially the same averment in his answer to the original complaint with respect to the time of change of domicile.

The chancellor found that the residence and domicile of the parties was changed from the State of Texas to the State of Illinois in 1932; that at the time of removal of the domicile of the parties defendant was insolvent; that when the parties left Texas and came to Illinois in 1932, defendant did not bring with him any property; that all the property now owned and held by defendant was acquired by him in the State of Illinois after changing his domicile to this State.

It is undisputed that substantially all of the property involved in the present controversy consists of shares of stock, which plaintiff alleges are worth in excess of three million dollars, which were acquired by defendant in 1935 in the Lloyd A. Fry Roofing Company, a Delaware corporation.

The evidence shows that from 1922 until June 1931, defendant was employed as a salesman selling roofing material. During this period he had saved and accumulated about twenty-five thousand dollars in cash from salaries, commissions and bonuses. In 1925, defendant purchased a home on Armstrong avenue in the City of Dallas, which was encumbered by a mortgage payable in monthly instalments.

In June 1931, defendant organized the Lloyd A. Fry Roofing Company of Texas, a Texas corporation. He put all of his savings in the corporation, which had a capital of twenty-five thousand dollars. Defendant owned all the stock in the Roofing Company. The main office of the corporation was located in Dallas. It also had an office in Chicago. During the first six months of operation the corporation sustained a loss of thirteen thousand dollars. In January 1932, defendant, in behalf of the corporation, borrowed fifteen thousand dollars from the Republic National Bank of Dallas. Four months thereafter the losses sustained by the corporation consumed the remainder of the capital and the bank loan. Shortly thereafter the Bank seized the office furniture and equipment and closed the corporation's main office for its failure to pay rent.

By April or May 1932, all the property defendant owned was some household goods and an equity in the Armstrong avenue home in Dallas. The last monthly instalment payment on the mortgage was made in May 1932.

The evidence further shows that in August 1931, the Frys closed their Armstrong avenue home in Dallas, placed their household goods in storage and went to Chicago to live at the Congress Hotel. In April 1932, defendant told plaintiff that "the business was not getting along so well," and suggested that she reopen the Armstrong avenue home in Dallas. Thereupon she returned to Dallas and had the house-

hold furniture taken from storage and placed in the home. Thereafter plaintiff's parents came to live with her. In May or June 1932, defendant directed her to sell the Armstrong avenue home. She listed it with local real estate dealers and, according to her own testimony, she "was just worn out from trying" to sell the premises. In the meantime defendant endeavored to refinance the mortgage on the property but was unsuccessful in obtaining a new loan. On July 4, 1933, for the purpose of extinguishing the mortgagor's rights, the property was sold at a trustee's sale to the Homeland Realty Company of Dallas, Texas. Failing to redeem, the Frys afterwards lost all their interest in the premises. In August 1933, at defendant's request, plaintiff closed the Armstrong avenue home and placed the furnishings in storage. Immediately thereafter plaintiff came to Chicago accompanied by her parents and resided with defendant at the Stevens Hotel. From August 1933 to December 1944, the Frys maintained no living quarters of any kind in Dallas.

There is a sharp conflict between the testimony of plaintiff and defendant as to the purpose of the visits made by defendant to the Armstrong avenue home. Plaintiff insists that she returned to the Armstrong avenue home in Dallas at defendant's request to reestablish the family residence there. Defendant testified that his trips to Dallas "at that period were rather consistent, in the effort to sell the home" and that he spent some time in August and substantially all of September, October and November 1932, in Dallas. Plaintiff says that when she reopened the Armstrong avenue home she did not know how much was paid on it or that they were later forced to vacate it because of the pending foreclosure proceedings, and that defendant did not tell her his business "went broke."

According to defendant's testimony, in May or June of 1932 "I very definitely told my wife we were through in Texas; we had lost everything except this

equity; that the opportunities in Chicago were much better by ten times than they were in Texas; that we had nothing left and that I proposed to dispose of my property or home if we could realize anything out of it but that definitely I was going to stay in Chicago. I came to Chicago in August 1931.''

Lloyd Fry, Junior, son of the parties, testified that in June 1932, his father told him that it seemed that the business was going in the wrong direction and that so far as he was concerned he would never go back to Texas.

The evidence further shows that while defendant resided at the Stevens Hotel in Chicago he voted in the presidential election in 1932, giving the hotel as his place of residence, and that during that year he registered his automobile in the State of Illinois.

On December 1, 1934, plaintiff rented an apartment on Normandy avenue in Dallas and removed the household furniture into it. Plaintiff's parents, Mr. and Mrs. Forrester, occupied this apartment continuously from the time it was leased until they went to California in April 1936. Virtually all the time the Forresters lived in the Normandy avenue apartment defendant aided them financially. At defendant's suggestion plaintiff returned to Dallas some time in March 1936 for the purpose of disposing of the household goods at the Normandy avenue apartment. On April 15, 1936, an auction sale took place at which the Frys' household goods were sold. Immediately after the sale plaintiff again returned to her husband at the Stevens Hotel in Chicago and plaintiff's parents, the Forresters, moved to the Baker Hotel in Dallas for a short time and later went to California where they spent the rest of their lives.

There is testimony tending to prove that defendant made occasional visits to the Normandy avenue apartment, although defendant testified, ''I never spent a single night in that apartment at any time.''

The evidence further shows that for the years 1932 to 1935, inclusive, defendant filed income tax returns for himself and wife in the office of the Collector of Internal Revenue at Dallas, reporting his income as being derived from community property, thus allocating one half of the income to himself and one half to the plaintiff. These income tax returns were challenged by the Department of Internal Revenue on the ground that the parties were domiciled in Illinois. In a sworn protest prepared and filed by the defendant, dated October 23, 1937, defendant took the position that he and his wife were domiciled in Texas. On February 10, 1938, the Chicago Division of the Department of Internal Revenue issued a "Memorandum of Conference" sustaining defendant's allocation of income. In his sworn protest defendant traced the domiciliary history of himself and wife from the time of marriage until 1937. It purports to show that the domicile of the parties was in Texas until April 1936.

Plaintiff argues that the reopening of the Armstrong avenue home in April 1932 was the beginning of a continuous span of family occupancy extending over a period of seventeen months, and that the Armstrong avenue home was not reopened merely for the purpose of sale.

We think the evidence would warrant a finding that in April 1932, defendant was in desperate financial straits; that plaintiff had knowledge of her husband's precarious situation; that she knew of the encumbrance on the home, and that the primary purpose of the Frys in reopening the Armstrong avenue home was to sell it so that they might get something for their equity.

As to the Normandy avenue apartment defendant testified that it was leased as a home for plaintiff's parents, the Forresters. It is uncontroverted that plaintiff's father paid the rent and received receipts therefor in his name; that he paid the electric bills; that it was occupied by the Forresters from the time

the premises were leased until the auction sale of the household furnishings; that plaintiff's father "took care of things" at the apartment because of plaintiff's absence and that during most of this period plaintiff lived with her husband in Chicago. Moreover, it is undisputed that in the fall of 1935, plaintiff signed the hotel register at the Biltmore Hotel in Los Angeles "Mrs. Lloyd A. Fry, Chicago." Afterwards she was joined there by her husband and on October 5, 1935, the Frys checked out of the Biltmore Hotel giving their home address as Chicago. In our opinion the evidence clearly sustains defendant's position that the Normandy avenue apartment was intended as a home for the Forresters and not for the Frys.

The domiciliary history of the parties which defendant traced in his sworn protest to the Internal Revenue office is in direct conflict with his testimony in the case at bar. Plaintiff maintains that the income tax returns and defendant's protest are of decisive significance, and asserts that the explanation offered by defendant seems to be that "all this should be taken quite lightly as a bit of genteel tax cheating and of no consequence in this case." In *Slater v. Munroe,* 313 Mass. 538, at page 546, the court said:

"The statements of the decedent in her tax returns and deeds, in the instrument offered for probate, and in some of her correspondence, that her legal residence was in Chicago, were competent evidence of her intention to retain her marital domicil. Those statements, however, are not conclusive. They may be sufficient to incline the scales one way or the other where the evidence presents a close question on domicil. They have little or no weight when they are inconsistent with the physical facts firmly established by the evidence or where they are contradicted by other statements of the decedent."

To the same effect are *In re Estate of Harkness,* 176 Cal. 537; *Rosenberg v. Commissioner of Internal Revenue,* 37 F. (2d) 808; *Texas v. Florida,* 306 U. S. 398;

*Commonwealth v. Davis,* 284 Mass. 41; *In the Matter of the Estate of Trowbridge,* 266 N. Y. 283.

Manifestly defendant was influenced by the advantage gained under the community property laws of Texas when he filed his income returns there. Even though his income was meager for the years 1932 and 1933 any advantage which accrued during the entire period by filing his income tax returns in Texas enured to the benefit of the plaintiff as well.

Domicile is so essentially a question of intent depending on the facts and circumstances of each particular case that precedents with necessarily varying facts are of slight assistance. (28 C. J. S., Domicile, sec. 18, p. 41.)

According to defendant's testimony, in May or June of 1932, he determined to make his permanent domicile in Chicago and at that time stated the reasons for the change to the plaintiff and their son. Several months after he voted in Chicago. The place of exercise of the elective franchise is important evidence on the question of domicile. (*Cobb v. Smith,* 88 Ill. 199; *Kreitz v. Behrensmeyer,* 125 Ill. 141.)

During the period covered by the income tax returns defendant had no business interests in Texas. His business and general interests were in Chicago and all of the property involved was acquired here.

It has been said that the determination of domicile depends upon no one fact or combination of circumstances, but upon the whole, taken together. From this point of view it is manifest that very slight circumstances must often decide the question. The determination depends upon the preponderance of evidence in favor of some particular place as a domicile. The conduct and the various acts of the party are not ordinarily conclusive of the question but are regarded rather as circumstances from which the court in its discretion may find the fact. (17 Am. Jur., Domicil, sec. 90.)

Defendant says that when plaintiff discovered, by means of pre-trial deposition, that defendant had acquired property after 1933, she amended her original complaint by alleging that the change in domicile took place in 1936. Obviously plaintiff could not recover under the allegations of the original complaint since the evidence shows that the property in question was acquired after 1932. It may well be that plaintiff in amending her complaint was motivated by the information she acquired in the pre-trial deposition, as defendant contends. But, in any event, we think that the amendment to her complaint, claiming that the change in domicile took place in 1936, was a matter for the chancellor to consider together with all the other facts and circumstances in evidence.

Since both parties concede there was a change of domicile, we hold that the chancellor properly held that the burden of proof was on the plaintiff to establish by satisfactory evidence that the domicile of the Frys was changed in 1936 as alleged in her amended complaint. The record in the present case consists of more than nine hundred pages, including many exhibits. To review and analyze all of the evidence in detail would unduly extend this opinion. Determination of domicile is mainly a question of fact. An experienced chancellor heard and saw the witnesses, and from a careful examination of the record we think the evidence warrants the findings of the chancellor, and that the decree properly denied the plaintiff's claim for an accounting of the alleged community property.

For the reasons assigned, the decree is affirmed.

*Decree affirmed.*

KILEY and BURKE, JJ., concur.