Louis Englestein, Appellee, v. Robert W. Mackie, Orrin L. Bernstein and City National Bank and Trust Company of Chicago, as Executors of the Estate of Harry M. Englestein, Deceased, et al., Appellants.

Gen. No. 48,159.

First District, First Division.

April 30, 1962.

Rehearing denied May 28, 1962.

Isaac E. Ferguson and Millikin, Vollers & Parsons, of Chicago, for certain defendants-appellants, and

George M. Burditt and C. Lee Cook, Jr. (Snyder, Chadwell, Keck, Kayser & Ruggles, of Chicago, of counsel), for defendant-appellant, co-party prosecuting separate appeal.

Charles T. Martin and J. William Hayton (Bell, Boyd, Marshall & Lloyd, of Chicago, of counsel), for appellee.

MR. PRESIDING JUSTICE MURPHY delivered the opinion of the court.

This is a suit in equity, primarily for a general partnership accounting between two brothers. The complaint was filed in 1944 by plaintiff, Louis Englestein, and his brother, Harry M. Englestein, was the principal defendant. A final decree, entered in 1960, found that the partnership began in 1912 and continued until 1959, when it was dissolved by the death of Harry. The decree directed liquidation of all of the remaining partnership assets by Louis, as the surviving partner. The decree also declared that the partnership owned shares of Chillo Corporation stock claimed by defendant Robert W. Mackie. Defendant executors of the estate of Harry M. Englestein, deceased, and defendant Mackie prosecute separate appeals.

The principal questions are the duration of the partnership, and the ownership of the residue of its assets, claimed by Harry as the sole owner.

In 1912, Harry and Louis, pursuant to an oral agreement, entered the real estate brokerage business, including management, insurance, and real estate investments. Harry was to receive 60% of the profits and Louis to receive 40%. Subsequently, the partnership engaged in many ventures and beneficially owned a wide variety of assets, including a number of buildings, real estate mortgages, bonds, and stocks.

In 1931, the partners executed an agreement entitled "Partnership dissolution agreement," to be effective May 15, 1931. Legal title to various parcels of

279

real estate was conveyed to 22 separate Illinois corporations organized by Harry and Louis for title holding purposes. Legal title to other partnership assets was transferred to Louis, as trustee. Because of the depression, their subsequent activities were devoted primarily to managing and salvaging their real estate investments.

In 1942, a controversy arose between them. In April, 1944, Louis filed his 8-count complaint in chancery, to which a ninth count was added in 1949. The defendants were Harry, Mackie, a number of individuals, and seven corporations organized by Harry and Louis. Each count of the complaint is a separate demand for recovery of specified shares of corporate stock alleged to be partnership assets wrongfully detained by the record holder thereof, and of which Louis is alleged to be owner, in whole or in part. The prayer of each count is for the assignment to plaintiff of a specified number of shares of the named corporation and an accounting to plaintiff for all dividends received upon the stock.

The answers of the defendants, except Mackie, allege in substance that the stocks standing in the name of each defendant are held as nominees of Harry. The answer of Mackie alleges 208 shares of Chillo Corporation were issued to him "as compensation for services rendered."

The answer of Harry alleges that in 1912 it was orally agreed by the partners that the net operating income to be derived from real estate and insurance brokerage, also from property management, should be divided 40% to plaintiff Louis and 60% to defendant Harry, but the net profits derived from the real estate investments were to be apportioned 50% to defendant Harry, the remaining 50% to be dealt with as operating income of the brokerage business (and thereby to become subject to the 60–40 agreement to divide net

280

operating income). He denies that the partnership at any time owned any of the properties or corporate shares described in the complaint.

Harry further alleges that the ownership of the properties described in the complaint was vested in him alone at all times; that "the entire amount paid for the capital stock of said corporations was paid by the defendant solely. Regardless of the manner in which the shares of capital stock of said corporations were issued, the defendant was in truth the beneficial owner of all said shares and all other persons to whom any of said shares were issued in 1931 (including the plaintiff) were merely the nominees of the defendant and had no beneficial interest in any of said shares." As to the Chillo shares, Harry answered that they were issued to Mackie for services rendered.

In 1945, the case was referred to a master in chancery for a hearing on the issues. In 1952, a very extensive master's report, dated March 21, 1951, was heard by Judge John J. Haas, to whom the case was then assigned. The master's report concluded that the real estate investments were partnership assets and belonged to the parties on a 60–40 ratio; that the partnership was dissolved May 15, 1931, and Louis was entitled to a "40% interest" in the remaining partnership assets. The master also reported that, in his opinion, Harry was entitled to 30% of the properties for extraordinary services rendered by Harry since 1931, "which 30% should be a first charge upon the properties before division on the basis of 60–40, as recommended."

On December 11, 1952, Judge Haas entered an order confirming and adopting the report, but entered no decree. Instead, he filed a written opinion on the issues of the case, which concludes as follows:

"The report of the master is predicated upon nearly 5000 pages of testimony, exhibits and briefs of counsel.

281

I have read his report, the briefs and the salient portions of the record and confirm the report in all respects except that I will not approve any decree until after counsel for the defendant signify their intention as to the disposition of their client's claim.

"The cause will be re-referred to the master to proceed in the accounting and the hearing of the matters that he concludes should be considered in conjunction with the accounting. All of the exceptions to his report will be denied."

Pursuant to leave granted by the order of December 11, 1952, Harry filed a counterclaim on February 10, 1953. It alleges that all of the shares of stock demanded by Louis were attributable solely to the accomplishments of Harry since May 15, 1931, and asks for an equitable reward for those services. The answer of Louis to the counterclaim denies that the partnership was, in fact, dissolved on May 15, 1931; alleges that the partnership continued to exist after May 15, 1931; asserts that the services of Harry were rendered during a continuing partnership, and that Harry "is entitled to no greater compensation than is provided for by the partnership agreement."

In 1954, Judge James R. Bryant, to whom the case was then assigned, entered an order granting leave to the plaintiff to file a "second amendment to the complaint as amended" and to add additional defendants. The order referred the case back to the master, with instructions to render a report on the legal relationship of Harry and Louis from May 15, 1931.

On April 3, 1958, a general report on the various issues of the case was submitted by the original master, then serving as commissioner. The report is primarily concerned with the actions and attitudes of the parties since 1931, and their effect on the counterclaim of Harry. It refers to, but does not restate, the conclusions and findings set forth in the original report of

March 21, 1951, and its supplements. It states that when the second amendment to the complaint was filed by Louis on September 23, 1954, Louis changed from his position of seeking the return of 40% of the stock in the various corporations, to the position that the partnership continued to the date thereof and it owned all of the stock in the various corporations; also, that he [Louis] claimed he had a 40% interest in the partnership, and prayed for a general partnership accounting and the appointment of a receiver to sell all of the assets and make distribution of the proceeds.

The findings of the special commissioner include: that the partnership was dissolved on May 15, 1931, and its assets distributed to the various corporations, and each partner "became entitled to his share of the stock therein in a 40–60 ratio as provided by the dissolution agreement of May 15, 1931"; that "as no partnership continues the parties are each entitled to their proportionate share of the stock in said corporation"; that although Harry did perform many services since 1931 in salvaging the assets, Louis "also did considerable work in this regard"; and as Harry, an officer and director of the various corporations, received compensation for his work therein, "no allowance can be made in this proceeding for such extraordinary services claimed to have been rendered by Harry"; that the counterclaim of Harry should be dismissed for want of equity; that Louis is not entitled to any general partnership accounting in this matter; that any accounting to be made must be made by the various corporations; and that he should have free access to examine the books and records of said corporations.

On September 3, 1959, the death of Harry on June 24, 1959, was suggested to the court, and his executors were substituted as defendants in his stead.

On September 10, 1959, the case was then assigned to Judge Grover C. Niemeyer, and he proceeded to a

hearing on the special commissioner's report, the exceptions thereto, and all matters in controversy between the parties.

On April 11, 1960, with leave of court, a supplemental complaint was filed, which relates the death of Harry and alleges that the continuing partnership between plaintiff Louis and defendant Harry was dissolved by Harry's death on June 24, 1959, and that plaintiff Louis "as surviving partner has the right to wind up the partnership pursuant to the Uniform Partnership Act." It concludes with a prayer for an order directing Louis to wind up the partnership in accordance with the Uniform Partnership Act.

On April 14, 1960, a decree was entered granting the relief prayed for in the supplemental complaint filed April 11, 1960, and referring the cause to a master in chancery to take a general partnership accounting pursuant to the principles of partnership law and the provisions of the decree. The decree stated that the matter had been heard for three days on the complaint and answer, other pleadings on file, upon the master's report of 1951 and its supplements, the objections thereto, the supplemental complaint and extensive briefs filed by all parties.

The decretal findings include: that in 1912, Louis and Harry entered into an oral partnership agreement to engage in business and to share profits, losses, assets, and liabilities in the proportion of 40% to Louis and 60% to Harry; that the partnership engaged in many ventures and beneficially owned a wide variety of assets, including real estate, mortgages, bonds and stocks; that legal title to partnership assets, including real estate, was in Harry's name, and when partnership real estate was mortgaged, Harry signed the mortgage; that pursuant to a written instrument dated May 15, 1931, the partners caused legal title to various parcels of real estate owned by the partnership to be conveyed to 22 separate Illinois corporations and

284

caused legal title to certain other partnership assets to be formally transferred to Louis, as trustee, and "thereafter said partnership beneficially owned all the shares of the various corporations and all the assets of the trust"; that "said partnership continued until it was dissolved by the death of defendant, Harry M. Englestein, on June 24, 1959"; that "the special commissioner's finding that the partnership was dissolved May 15, 1931 is overruled"; that "the assets of said partnership at the time of said dissolution include but are not limited to all the shares of the following corporations: . . ."; that "all services performed by defendant, Harry M. Englestein, to the time of his death on June 24, 1959, were performed pursuant to the continuing 40–60 partnership arrangement between plaintiff and defendant and said defendant is not entitled to any additional compensation as prayed in defendant's counterclaim. The counterclaim of defendant, Harry M. Englestein, is dismissed for want of equity."

The decree further finds that "An accounting shall be had pursuant to the principles of partnership law. Among other things plaintiff shall account for all salaries credited to his account (including all salaries paid) and defendant executors shall account for all salaries credited to the account of defendant, Harry M. Englestein (including all salaries paid) from all corporations, all of whose shares are beneficially owned by said partnership as listed in paragraph 9 hereof, including all corporations which have been merged in the corporations listed in paragraph 9 and including all corporations which have been dissolved since May 16, 1931, all of whose shares were beneficially owned by said partnership during their corporate existence. Said accounting shall be for the period from 1912 to the date of this decree."

The decree further finds that the partnership owns all of the outstanding shares of Chillo Corporation, and that "all shares of said corporation issued in the

285

name of defendant, Robert W. Mackie, were issued without consideration and said shares are void and should be cancelled. . . ."

The decree ordered the defendant executors of the estate of Harry to transfer and deliver all partnership assets to plaintiff Louis, "as surviving partner," and directed him as surviving partner to wind up the partnership affairs "by selling all the partnership assets at public or private sale . . . and the proceeds shall be used to discharge all partnership liabilities and the excess shall be used to pay in cash the net amount owing to plaintiff and the net amount owing to the defendants, as executors of the estate of Harry M. Englestein, deceased." The decree referred the cause to a master in chancery "to take a general partnership accounting pursuant to the principles of partnership law and pursuant to the provisions of this decree."

The decree further directed that, in the event the partnership assets remaining after paying all partnership liabilities "are insufficient to satisfy the net amount owing to plaintiff, plaintiff shall have a judgment against the estate of Harry M. Englestein, deceased, for the balance of the net amount owing to plaintiff."

It is from this decree that defendant executors of Harry M. Englestein and defendant Robert W. Mackie have filed separate appeals, which are separately considered.

As to the partnership, the determinative question is the beneficial ownership of the assets, the residue of the real estate investment business, which are claimed by Harry as the sole owner. If, at his death, Harry was the beneficial owner of the assets in controversy, all partnership questions, including the propriety of an equitable reward for Harry's services and accomplishments since 1931, are moot.

286

It is impractical to outline or discuss in detail the voluminous evidence. There were many witnesses and exhibits. Both Harry and Louis testified at length and completed their testimony prior to Harry's death. Neither ever discussed the partnership arrangement with any outsider, and there is irreconcilable conflict in their testimony on the important questions. The numerous exhibits include partnership and corporate records—such as books, income tax returns, audits, financial statements, the 1931 dissolution and trust agreements, and partnership notes.

■■ As to the evidence, we have endeavored, as required by equity, to discover the real intention of the partners, as gathered from their conduct and the circumstances of their transactions. Equity will look through form to the substance of a transaction in order to ascertain the true relationship of the parties. Carrillo v. O'Hara, 400 Ill 518, 530, 81 NE2d 513 (1948).

■ In a chancery case, the facts are found by the chancellor, and the master's report, while prima facie correct, is of an advisory nature only. (Zilvitis v. Szczudlo, 409 Ill 252, 255, 99 NE2d 124 (1951).) A reviewing court must always consider whether the decree rendered is a proper one under the law and the evidence. (Layton v. Layton, 5 Ill2d 506, 512, 126 NE 2d 225 (1955).) The rule that the findings of the chancellor will not be overruled unless manifestly against the weight of the evidence does not apply where the chancellor did not hear any testimony in open court and did not approve or adopt the findings of the master. (Maley v. Burns, 6 Ill2d 11, 20, 21, 126 NE2d 695 (1955).) Where all the testimony is taken before a master, and while his findings are advisory only and are not binding upon the trial court or a reviewing court, yet his findings are entitled to due weight on review of the cause. Kolze v. Fordtran, 412 Ill 461, 468, 469, 107 NE2d 686 (1952).

As to the law, the partnership principles and law applicable here, later set forth, are sufficiently settled. Therefore, the numerous authorities cited by both sides, as pertinent to and controlling the issues, are not discussed.

As between the parties, the existence of a partnership relation is a question of intention to be gathered from all the facts and circumstances. Written articles of agreement are not necessary, for a partnership may exist under a verbal agreement, and circumstances may be sufficient to establish such an agreement. Such factors as the mode in which the parties have dealt with each other, the mode in which each has, with the knowledge of the others, dealt with other people, and the use of a firm name, have been deemed material in determining the existence of a partnership. The essential test, however, is the sharing of the profits, but it is not necessary that there be a sharing of the losses in order to constitute a partnership. Rizzo v. Rizzo, 3 Ill2d 291, 300, 120 NE2d 546 (1954).

Dissolution of a partnership is defined in Section 29 of the Uniform Partnership Act (Ill Rev Stats 1959, c 106½) as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." The effect of dissolution is defined by Section 30: "On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed." A dissolution may be brought about by a partner (Section 31) or by a decree of the court (Section 32) for any of the causes cited.

The terms "dissolution" and "termination," as employed in the Partnership Act are not synonyms and, as used, have different meanings. Dissolution does not terminate the partnership and does not end

288

completely the authority of the partners. The order of events is: (1) dissolution; (2) winding up; and (3) termination. Termination extinguishes their authority. It is the ultimate result of the winding up and occurs at the conclusion of the wind up. Thanos v. Thanos, 313 Ill 499, 506, 145 NE 250 (1924); Duncan v. Bartle, 188 Ore 451, 216 P2d 1005, 1012 (1950).

█ The defendant executors argue that the decision of the chancellor, who heard no evidence, that the partnership continued to operate after May 15, 1931, until the death of Harry twenty-eight years later, is "starkly unrealistic," and that the master, who began hearings in 1945 and "had occasion for fifteen years to consider in extraordinary detail all facets of the partnership business, found no trace of continuance of the partnership after May 15, 1931." They also argue that the record is devoid of evidence of any functioning by Harry and Louis as a partnership after 1931, and that all associated business acts of Harry and Louis after May 15, 1931, were acts in disposition of pre-1931 debts and obligations, or acts as codirectors, officers, employees or stockholders of record of one or another of the entities organized upon dissolution of the partnership.

The testimony of Harry shows that in 1912 he had been in the real estate business for about six years; that he had $6,000 in cash plus vacant lots valued at $12,000, none of which he admits putting into the partnership. He said, "I did not contribute any real estate to the partnership. All I agreed to, in the partnership, was to give a portion of profits that would result from sale or operation. All of the real estate was mine as investor . . ."; and the $6,000 "was in the same category as the real estate." He stated that Louis had worked at miscellaneous jobs, none of them connected with real estate; that Louis contributed $350 to the partnership; that the investment capital used in the

289

partnership operations was the $350 of Louis and the use of Harry's cash and real estate.

Harry testified further that he, personally or through his nominees, held record title to all properties dealt with by the partnership; that every mortgage on the properties was executed by Harry individually, or by a nominee guaranteed against loss by Harry, and on May 15, 1931, the aggregate of his personal indebtedness was $3,250,000, exclusive of unpaid and accrued interest and taxes; that every real estate transaction in which the partnership had an interest from 1912 to 1931 was initiated, negotiated and consummated by Harry, and Louis had nothing to do with the properties until they came under the management of the partnership.

Harry testified that the dissolution agreement of 1931 was brought about by the "great depression on at that time," and creditor proceedings against him would immediately put in jeopardy all assets in his name; that "the execution of the dissolution agreement safeguarded the interest of the creditors because it put me [Harry] in a position whereby I could trade and deal with each mortgagee"; that when the corporations were organized the shares issued to Louis were endorsed by him and delivered to Harry, and "I used them as they were mine"; that the recitals in the dissolution agreement regarding the nature and terms of the partnership agreement, setting forth the respective interests of the parties in the assets listed in the agreement, were not true, and that it was not intended that Louis should get the benefits granted to him in the agreement.

On May 15, 1931, even crediting the partnership with the entire beneficial interest in all properties and other assets claimed by Harry, the net worth of the partnership, as reflected in its books, was *minus* $237,000.97. By the end of 1935 Harry had achieved,

by court decree, the discharge of his $1,750,000 bond indebtedness on a building at 47th and South Parkway, and the discharge of his indebtedness on many other mortgages, mainly by conveyance of titles in satisfaction of the mortgages. This resulted in the liquidation of many of the title holding corporations.

By 1935, the danger of drastic action by creditors had abated, but there was no equity value in the remaining properties and business enterprises. As stated by the defendant executors, the record indicates that all of Harry's "time and effort from May 15, 1931, until his death twenty-eight years later was devoted to the business of the 1931 entities from time to time surviving and to his employment as managing agent of the South Parkway Building Corporation," which included the South Center Department Store and the Union Amusement Company.

During the years after May 15, 1931, Louis, as before, attended to the administration of the real estate agency business, of which the mainstay was management of the properties conveyed to the building corporations and the trust organized pursuant to the "partnership dissolution agreement." Louis also attended to administration of the office, keeping of accounts, property maintenance, leasing of apartments and stores, collection of rents, and the insurance brokerage.

After May 15, 1931, one of the corporations organized by Harry and Louis in 1931, known as Harry M. and Louis Englestein, Inc., served as the fiscal medium of all the 1931 building corporations as well as managing agent, and all revenue of the building corporations cleared through the agency corporation. Both Harry and Louis made personal withdrawals from its bank account at will, in the same unmeasured manner as during the 1912–1931 era. Withdrawals were made from this account to make payment in settlement of pre-1931 liabilities not assumed by the

291

corporations, and all such withdrawals and debit charges were entered against Harry and Louis personally, in conformity with the 60–40 ratio set up in the "partnership dissolution agreement." Nothing was ever done about these charges other than to carry them on the books of the corporation without a settlement at any time.

A fund to offset their personal charges was created by charging the building corporations that had net earnings with officers' salaries for Harry and Louis, generally on a 60–40 basis, and crediting the amounts to them in their personal accounts with the agency corporation. Such salaries were reported by them in their income tax returns for the years in which the salaries were voted, although not in fact paid to them either by the building corporations or by Harry M. and Louis Englestein, Inc. Further, to help provide a fund for payment of pre-1931 debts and living expenses, Harry also deposited in the bank account of the agency corporation his earnings as managing agent of South Parkway Building Corporation. He continued this practice until 1942, when the controversy arose between him and Louis.

The master and both chancellors gave decisive effect to certain aspects of the partnership bookkeeping. Until 1923, Louis alone kept the books, and after that, when an accountant was hired, Louis instructed him on how the books were to be kept. Both brothers testified that Harry knew nothing about the books and had nothing to do with the manner in which they were kept. The income tax returns of Harry, Louis and the partnership are in evidence. The 1930 and prior partnership returns show that the profit on the sale of capital assets, income from rents, deductions for interest, taxes, and depreciation, and the net partnership income was allocated between Harry and Louis on a 60–40 basis, and their individual tax returns followed

292

through with the amounts shown on the partnership returns.

The first income tax return for the new agency corporation, Harry M. and Louis Englestein, Inc., was for the year 1931. The return states that the corporation acquired certain property formerly owned by the partnership. "Compensation of officers," with Harry as president and Louis as secretary, shows a 60–40 split. The 1932 return shows the same 60–40 split. Both individual returns for 1933 and 1934 list investment losses incurred when properties, turned over to the new building corporations, were surrendered to the mortgagees in satisfaction of the mortgages. Harry's returns state: "My interest in the property and stock of the corporations was 60%." The returns of Louis are identical except that they show his interest as 40%. The 1934 individual returns also show their sole income to be salaries from the various corporations in a 60–40 ratio. Numerous income tax returns of the building corporations are in the record. All of these bear the notation, "On May 16, 1931, this corporation acquired one piece of property which with other properties was formerly owned by Harry M. and Louis Englestein, a partnership."

In evidence are three audit reports, prepared by certified public accountants before the dispute arose between Harry and Louis. The first is a partnership report for the period between July 1, 1925, and December 31, 1926. The balance sheet shows real estate investments at a cost totaling $808,010.55. This is broken down into unimproved property, including the South Parkway property, 15 items of improved property, and equities in syndicates. It also shows as liabilities of the partnership real estate mortgage loans totaling $605,400, secured by 17 parcels of real estate.

The second partnership audit is for the year ending December 31, 1928. The balance sheet shows real estate

investments at a cost amounting to $2,539,735.97 and mortgage loans of $2,502,729.17. The 47th and South Parkway property is carried as an item of real estate owned by the partnership and shows the construction account with a total value of $1,893,945.81. The bond issue on this property of $1,750,000 is carried as a liability of the partnership.

The third audit report is for the period from May 16, 1931, to December 31, 1935, and covers the balance sheets and statements of operations of the various corporations and the Englestein trust. A letter of transmittal, dated November 9, 1936, addressed to both Harry and Louis, stated that "Prior to May 16, 1931, the assets and liabilities (including various real estate holdings) appeared on the books of the partnership of Harry M. and Louis Englestein. On May 16, 1931, corporate bodies and a trust were created (as mentioned above), and the assets and the liabilities that were on the books of the partnership were transferred to the trust and to the corporations and are detailed on exhibits 'A' and 'B'."

As to these audits, the master in his report of March 21, 1951, stated that "It is inconceivable that a person of Harry's intelligence and business ability would let go unnoticed the audit reports showing as partnership properties the properties he claimed as his own without making any comment about them. There is nothing in the record to show that he ever complained to the auditors that the audits were incorrect or that the books did not properly reflect his understanding of the partnership."

Harry's contention that it was never intended that the real estate investments carried in his name be part of the partnership assets, and that he, at all times, was sole owner, is not supported by the evidence. While the activities of Harry resulted in a very beneficial salvaging operation, nevertheless the assets in contro-

versy are the residue of original partnership assets in the changed corporate form, the beneficial interest of which remained always in the undissolved and basic partnership. Therefore, we concur with the finding that the assets in controversy are partnership assets.

 The 1931 dissolution agreement, Harry testified, was not intended to mean what it said when it made a division of partnership assets, and the chancellor was required to determine the intentions of the parties, "as gathered from all the facts and circumstances." (Rizzo v. Rizzo, 3 Ill2d 291, 120 NE2d 546.) The post-1931 acts of the partners demonstrate that all pre-1931 partnership activities continued substantially unchanged until 1937, when Harry organized a personal corporation and, "without formal agreement or accounting, the business of Harry M. & Louis Englestein, Inc., became the personal business of Louis Englestein." The 1937 changes did lessen the area of the 1912 partnership activities, but, as to the remaining partnership assets, there was no change in the partnership relation. They continued to join together "to carry on a trade or venture for their common benefit, each contributing 'property or services.'" Kurtz v. Kurtz, 10 Ill App2d 310, 315, 134 NE2d 609 (1956).

Although, as argued by the defendant executors, all associated business acts of Harry and Louis after 1931 may have been in disposition of pre-1931 debts and obligations, the pattern of their acts was the same as before 1931. All the corporations formed were treated as assets within the partnership.

 Declarations of dissolution have little or no weight when they are inconsistent with the physical facts firmly established by the evidence, or where they are contradicted by other statements of the declarants. (Fry v. Fry, 332 Ill App 484, 491, 76 NE2d 225 (1947).) There was no true dissolution and wind up of the original partnership assets at any time up to Harry's death.

As found by the master in his 1951 report, we conclude the real purpose of the 1931 agreement was "to protect the properties from recourse by any one particular creditor so that in the event a deficiency judgment might be obtained on one mortgage it would not affect title to other properties held in Harry's name," and that "neither party relies upon the dissolution agreement for his various rights." It follows that the 1960 decree of Judge Niemeyer is correct in finding that the 1912 partnership continued until the death of Harry.

Our conclusion that the chancellor was correct in his finding that the partnership was not dissolved by the 1931 agreement disposes of defendant executors' contention that "the essential purposes of the agreement and the provisions for distribution of the shares of the new entities were patently severable." This being so, whether the 1931 agreement was "patently severable" need not be decided. The chancellor did not evade the solution "of the matters submitted for adjudication."

■ The defense of laches, asserted by the defendant executors, is not available here. As stated in Korziuk v. Korziuk, 13 Ill2d 238, 242, 148 NE2d 727 (1958):

"The general rule, subject to a few exceptions, is that an action for a partnership accounting cannot be brought until the partnership has been dissolved. So long as a partnership continues, failure to demand a partnership accounting does not amount to *laches*."

■ The counterclaim of Harry was properly dismissed. We concur with the finding that Harry's services are not specially compensable because rendered for a continuing partnership. Section 18 of the Partnership Act provides that "No partner is entitled to remuneration for acting in the partnership business, except that a surviving partner is entitled to reason-

296

able compensation for his services in winding up the partnership affairs." The rule was settled early in Illinois that "in the absence of a stipulation to that effect, one partner is not entitled to charge his co-partners for his services, or because he has done more than his just proportion of work. The law never undertakes to measure and to settle between the parties their various and unequal services bestowed upon the joint venture." (Burgess v. Badger, 124 Ill 288, 301, 14 NE 850 (1888); Bach v. Bach, 373 Ill 442, 445, 26 NE2d 858 (1940).) That part of the decree which directs that both parties shall account for all salaries credited to their accounts, from all corporations beneficially owned by the partnership, gives equitable relief consistent with the equitable rights of both parties.

■ We find no error in permitting plaintiff to file an amended complaint in 1954, wherein the claim of the continuing partnership was first made. The amendment was largely to conform the pleadings to the proof and to state issues which have been implicit in this case from the start. Defendant Harry understood the nature of the claim he was called upon to meet, and he was not misled to his prejudice. We believe the order was a proper exercise of sound discretion and promoted "the ends of justice." Deasey v. City of Chicago, 412 Ill 151, 157, 105 NE2d 727 (1952).

■ As the death of Harry dissolved the partnership, the decree is correct in directing the winding up of the partnership affairs by Louis, as surviving partner, in accordance with Section 37 of the Partnership Act.

■ The sole issue in the separate appeal of defendant Mackie is whether he owns the 276 shares of Chillo Corporation stock issued to him from 1936 through 1945.

Chillo Corporation was organized January 8, 1936, by Harry and Louis, and its assets consist of beneficial

interests in three parcels of real estate. Its first asset, acquired in 1936, is a ¼ interest in 6402–08 South Halsted Street, commonly referred to as the Mintz parcel. Its second asset, acquired in 1937, is a ⅝ interest in 435–449 East 47th Street, referred to as the Lurie parcel. The third asset, acquired in 1952, is 140 shares of 6217 South Halsted Street Corporation. All three beneficial interests, which eventually found their way into Chillo Corporation, were partnership assets transferred into the Englestein trust in 1931.

Mackie asserts the 276 shares of stock were issued him in payment of salary for services performed for the corporation. In count III of the 1944 complaint, Louis alleges that Mackie "paid no consideration to Chillo Corporation" for his shares, and "in fact performed no services for said purported salary and in fact no salary was paid to him by Chillo Corporation."

Mackie's testimony shows that he was a University of Chicago graduate and had majored in and taught accounting. He was employed by Harry and Louis in 1925, and his first duties were collection of rents and supervision of repairs. Prior to 1931 he had nothing to do with the books of the partnership or the preparation of income tax returns. Mackie became an officer of all of the 1931 corporations. Since that time he has been employed exclusively by the separate entities and subsequently created corporations, including Chillo Corporation. His services covered a wide range of activities. Harry testified that Mackie handled the books, helped in the management of the properties, and "anything that has to do with the assets I am interested in. Mr. Mackie is always with me and a great help." An exhibit shows that Mackie's salary between 1936 and 1953 was paid by the Union Amusement Company and Chillo Corporation. The portion allotted to Chillo Corporation was paid by the issuance of Chillo Corporation stock.

298

Mackie's testimony shows that the management of the Mintz parcel since 1930 has been in the hands of Mr. Mintz. "He collects the rents and makes the disbursements." As to the Lurie parcel, "Lurie collects rents and makes disbursements in connection with the Lurie property on 47th Street." Mintz made a small charge for his services, and Lurie made a management charge of 4% of the rentals. Mackie testified that he served as an officer and director of Chillo since 1936; that he assisted in some lease negotiations and repairs to the Mintz and Lurie parcels; that he handled or supervised the bookkeeping and prepared the annual Chillo income tax returns; that he rendered similar services to all of the corporations in which Harry and Louis had an interest; that he declared in his income tax returns the value of the Chillo stock issued to him as salary; that his income taxes for the years between 1937 and 1942, inclusive, were paid by checks of Harry M. and Louis Englestein, Inc., and "those payments were charged ultimately to the personal accounts of Harry M. Englestein and Louis Englestein and not to my account."

The record shows that Chillo Corporation was used to further the interests of all the Englestein enterprises, and no dividends were ever paid. At one time, a $150,000 mortgage was placed on the Lurie parcel, of which Chillo received ⅝ of the proceeds ($93,750), and Chillo immediately lent $112,000 to South Center Department Store on a ten-year, unsecured note. The interest rate on the mortgage was 4½%, and the rate on the store loan was 3%. Plaintiff argues that "this transaction of borrowing money at 4½% and lending it at 3% merely reflects the fact that the partnership owns Chillo and likewise owns the store."

As to Mackie's services on behalf of Chillo, the special commissioner reported, "Nowhere in the record do we find any great activity on the part of anyone in

299

connection with Chillo inasmuch as the properties were operated by others," and further, "There is no evidence that Mackie rendered valuable services for the shares issued to him, that they were issued to him without consideration and that said shares should be cancelled." The commissioner further found that the ownership of the shares of stock in Chillo should be 40% to Louis and 60% to Harry. The chancellor found that the shares issued to defendant Mackie "were issued without consideration and said shares are "void" and decreed that the certificates be cancelled.

Defendant Mackie contends that he rendered valuable services to Chillo, and the chancellor should not have substituted his judgment for the judgment of the Chillo board of directors, where consideration was present.

As to the Mackie-Chillo Corporation findings of both the commissioner and the chancellor, in the light of the facts and circumstances appearing in the record, we cannot say that an opposite conclusion is clearly apparent. Therefore, this portion of the decree should be affirmed, as it comes within the well established rule that "a master's findings of fact, when approved by the chancellor, will not be disturbed unless manifestly against the weight of the evidence." Staude v. Heinlein, 414 Ill 11, 18, 110 NE2d 228 (1953); Majewski v. Gallina, 17 Ill2d 92, 99, 160 NE2d 783 (1959).

For the reasons stated, the decree is affirmed in its entirety, and the cause is remanded with directions to proceed in accordance with the provisions of the decree.

Decree affirmed and cause remanded with directions.

BURMAN, J., concurs.

ENGLISH, J., dissents.

MR. JUSTICE ENGLISH, dissenting:

I believe the chancellor's decree regarding ownership of the 276 shares of Chillo Corporation should be reversed and Mackie should be declared to be their owner.

It should be borne in mind that plaintiff has the burden of proving that there was *no* consideration for the issuance of the Mackie shares. In this, plaintiff has failed in two ways: no witness testified that Mackie performed no services for the corporation; while, on the other hand, there is testimony throughout the record that Mackie actually did render such services.

Mackie was an officer and director of the corporation during the entire period in question except for about six months when he was in the army. While the real estate owned by the corporation was actively managed by others, Mackie assisted in the negotiation of some leases; was present during negotiation of other leases; consulted with the building managers in regard to the negotiation of still other leases; executed leases on behalf of the corporation; attended, and during some years presided at, meetings of the board of directors; consulted and advised with the managers of the properties concerning repairs; arranged and did all preliminary work in the selling of electric current to the tenants of both properties, which resulted in an income increase in excess of $2,500 per year; at the outset of this arrangement, Mackie handled the billing of electricity to the tenants for several months before turning it over to Mintz and Lurie, and, after that, reviewed the electric account from time to time. Mackie audited the Lurie records submitted to Chillo Corporation, which had no auditor other than Mackie; he also made an internal check of the Mintz figures which were audited independently; Mackie was consulted with respect to loans made by Chillo and at various times handled such loans on behalf of the corporation; he

301

made or directed entries in the books of the corporation; he prepared the corporation's income tax returns during the entire period in question, and consulted with plaintiff in regard to them until this suit was filed in 1944. As secretary-treasurer from 1936 to 1942, as president from 1944 to 1946, and as secretary after 1946, Mackie's signature appears numerous times in the corporation's minute book. In his individual income tax returns throughout the period in question, Mackie declared the value of the shares as income received by him.

In each of the years 1936 through 1945, the Chillo board of directors adopted a resolution directing that Mackie be paid a specified sum of money for his services rendered during that year. The amounts ranged from $2,000 to $4,000, and averaged less than $3,000. The compensation thus authorized was paid to Mackie each year by the issuance to him of Chillo stock at par value, representing, in the aggregate, the 276 shares which are the subject of this dispute.

Thus, both the minute book and the stock record book of the corporation indicate that the shares were issued to Mackie at full par value for the amounts each year declared by the board of directors to have been the value of his services. Section 18 of the Business Corporation Act therefore becomes pertinent. (Ill Rev Stats, c 32, § 157.18.) It reads in part as follows:

> The consideration for the issuance of shares may be paid, in whole or in part . . . in labor or services actually performed for the corporation. . . . *In the absence of actual fraud in the transaction, the judgment of the board of directors . . . as to the value of the consideration received for shares shall be conclusive.* (Emphasis supplied.)

From this it is apparent that the extent of the services rendered, or the value of the consideration thereby

302

paid, are matters which may not properly be the subject of inquiry by either the chancellor or this court in the absence of actual fraud, a charge which has not been made in this case. It is not enough, therefore, to find that the services rendered were of *insufficient* value to support the issuance of the shares in question. Yet that seems to be at the base of the conclusion reached by the master and accepted in the majority opinion. As there quoted, the master found that "Nowhere in the record do we find *any great activity* on the part of anyone in connection with Chillo." *Great activity* is not required to support the directors' determination of value; only *some activity* by Mackie.

Plaintiff's brief, likewise, fails to recognize this principle. There it is conceded, for example, that "Mackie may have signed (the $60,000 mortgage) as secretary of Chillo"; that Mackie's assertion of participation in setting up the electricity billings to tenants "gets pretty thin when it is spread back to 1936 and forward through 1945"; that Mackie's testimony that he made his own internal audits of the Mintz and Lurie accounts "is pretentious"; etc.

I deem it indisputable that the multiple services of Mackie to the corporation, as outlined above from the record, had *some* value. That being the case, the conclusion that he paid *no consideration* for the shares must fall, because both statute and case law make it clear that a court is not permitted to substitute its judgment for that of the directors on the issue of consideration. (Elward v. Peabody Coal Co., 9 Ill App2d 234, 247, 132 NE2d 549, and cases there cited.) Unless, of course, there is "actual fraud in the transaction," but here, as mentioned, there was neither charge nor proof of fraud.

For these, and other reasons based on laches, estoppel, and general principles of equity, I believe the majority reaches an incorrect conclusion as to the Mackie stock.

303

As to the basic litigation, I agree with the master who found that the 1912 partnership was brought to an end by the written "Partnership Dissolution Agreement" of May 15, 1931.* This contract between the two brothers contained the following paragraph:

> The partnership heretofore existing between the parties hereto is hereby declared to be dissolved and terminated as of the 15th day of May, A.D. 1931.

It surpasses my understanding that a man of plaintiff's business experience and qualifications, after signing such an agreement, could have been a partner in a multi-million dollar enterprise for 23 years without knowing it. Yet, during the 13 years following the dissolution agreement, and at the commencement of this litigation in 1944, he made no such claim of continuing partnership; during the master's hearings extending over a period of some eight years, at which plaintiff was represented by highly competent counsel, he made no such claim; when the master filed his original report, plaintiff filed no objection or exception to the master's finding that the partnership had ended in 1931; and, during two years of further hearings on re-reference, he made no claim of a continuing partnership. Then, on September 23, 1954, such a claim was made for the first time when plaintiff sought, and obtained, permission to file his amended complaint and proceed on that theory.

In view of the late date at which this extraordinary claim of a continuing partnership was first asserted, it is interesting to note that after 1931 there was no partnership business, designated as such; there was

---

* The master reached this conclusion in both his reports; on the original reference (1944–1952), and on the re-reference after filing of the Amended Complaint (1954–1959).

no transaction with any person in the name of a partnership; neither brother ever signed any contract or other document on behalf of a partnership, nor did either one ever represent to anyone that a partnership existed; there were no partnership books, bank accounts or tax returns; neither brother ever made or demanded a partnership accounting until plaintiff filed his amended complaint in 1954; plaintiff operated a real estate business of his own, acquired various real properties in his own name, and purchased shares of South Parkway stock for his own account, all without accounting or offering to account to his brother; and so on.

A full review of the evidence in this voluminous record, for the purpose of reciting the facts as I view them, would so enlarge this opinion as not to seem justified, under all the circumstances. I shall only conclude, therefore, that the accounting to be made should, in my opinion, be based upon a dissolution of the 1912 partnership in 1931.